The opinion of the court was delivered by
Blanchard, J.
Plaintiff’s action is one sounding in damages for *1030 violation of the obligations of a lease. He claims twenty-four thousand two hundred dollars, and from a judgment in his favor for thirteen thousand eight hundred and sixty-four dollars and twenty-four cents, defendant prosecutes this appeal.
As briefly summarized as possible the facts are these:
In December, 1891, Emile Bauman rented from E. I. Kursheedt, agent, the property No. 14 Magazine street (old number), corner of Common street, New Orleans, for two years and nine months from January 1, 1892, at a rental of one hundred and fifty dollars per month, with privilege of renewal for three years more.
On the 16th of February following the plaintiff acquired this lease by transfer from Bauman, and thereupon caused the same, with his transfer, to be inscribed in the conveyance office. His object was to establish a hotel and barroom in the premises, and to this end he entered into an agreement with Bauman, in which it was stipulated plaintiff should cause the necessary alterations and improvements in the building to be made at his expense so as to convert it into a hotel, and Bauman was to manage the hotel and receive one-half of the profits of the venture and $40 per month additional as compensation for his services.
The bu.ilding had originally been constructed for and long used as a store. It was four stories high. The three upper stories were subdivided, under plaintiff’s orders, into six rooms each, and on the lower floor a barroom was elaborately fitted up. The walls of the rooms were papered, staircases constructed, an elevator and other improvements put in, the rooms carpeted, and furniture, bedding, etc., supplied. The whole cost of the improvements and outfit is alleged in the petition to have been seven thousand five hundred dollars.
About the middle of March, 1892, the hotel opened with promise of a profitable business.
Defendant owned the adjoining property, known then as Nos. 10 and 12 Magazine street, and in February, 1892, by resolution”of its board of administrators, decided to erect thereon an eight-story building, which Dwyer Bros, had contracted to lease for five years for annual rents aggregating thirty-eight thousand dollars. Accordingly, the old structure was demolished and preparations made for beginning work on the new.
But before the work of demolition was completed, trouble arose in regard to No. 14 Magazine street.
*1031 This building was high and narrow, not exceeding twenty-two feet wide.
Unless care was taken by defendant in demolishing its adjoining building, it was evident No. 14 would be greatly injured, if not destroyed. Indeed, the latter result was imminent unless the outer wall of No. 14 was repaired and strengthened.
Confronted by this complication, defendant corporation convoked a meeting of its real estate committee on March 20, to consider the situation. The chairman of the committee gave information as to the dangerous condition of No. 14, and stated that the city authorities had been called upon to condemn the building. By whom called upon was not stated. Presumably by defendant’s agents. It was further stated that the condemnation had not been ordered because the City Surveyor and an architect representing the owner had agreed that the danger to the building could be averted by repair of its walls.
But as this would cause delay and the property in question could be bought for twenty thousand dollars, the chairman recommended its purchase. Whereupon the committee then and there gave the necessary authorization to the chairman to purchase it. The reason assigned was the importance of having the new buildings on Nos. 10 and 12 Magazine street erected as soon as possible, to meet the rental engagement with Dwyer Bros., who were to have possession by October 1, and because the purchase of No. 14 would facilitate the more rapid construction of Nos. 10 and 12.
Notwithstanding this authorization to purchase No. 14, no immediate steps to that end were taken, and the effort to have the city authorities condemn the building continued. On the 4th of April defendant’s acting secretary addressed a letter to the Mayor, urging its examination and condemnation. Previous to that, however, the architect, Freret, employed by the owners, had, in view of the work of demolition of the adjacent building then going on, examined the structure at No. 14, and had reported that he considered it imprudent to remove the party wall between Nos. 12 and 14 without adequate precautions, or the correction of the defects in the Common street wall of No. 14.
This report was forthwith forwarded by the agent of the owners ' to defendant with a communication calling attention to it, and cautioning defendant to see that no unnecessary damage was done *1032 to No. 14 by the demolition of the old and the construction of the new building on Nos. 10 and 12 adjoining.
The city authorities had the building at No. 14 examined pursuant to the request of defendant, and on April 11, issued an order to the agent of the owners to correct the dangerous condition of the building within five days, but gave no order as yet of condemnation.
The owners did nothing. The reason is apparent. Defendant corporation had already authorized the purchase of the property, and negotiations to this end were in progress between the agent of the owners and the agents of defendant. The latter made an offer for the property on the 15th of April, or a few days before that date, as testified to by the agent of the owners, and the agent wired his principals on the 15th, to know if they would sell. They replied affirmatively, and on April 22 he accepted for them defendant’s proposition to purchase, and on same day notified his principals he had sold. The next day, April 23, this agent received a communication from the Secretary of the Mayor, complaining that nothing had been done toward improving the condition of No. 14 Magazine street, in compliance with the Mayor’s order of the 11th, and demanding the demolition of the building or its satisfactory repair. The agent immediately endorsed on this communication these words: “ The within letter is respectfully referred to Mr. Oartright Eustis, chairman Tulane Educational Fund — the building referred to having been' purchased by the administrators of said fund,” signed the endorsement and forwarded it to defendant. After this neither the owners nor their agent had anything to do with the property No. 14 Magazine street, and the same passed under the control and direction of defendant purchaser. This is conclusively shown by the evidence, and especially by a letter addressed to the plaintiff, lessee of the premises, on April 23, by the secretary and treasurer of defendant, wherein it is stated that the city authorities having condemned the building, he (plaintiff) was notified to remove therefrom within forty-eight hours, as the work of demolition would begin at the end of that time. “We give you this notice,” continues the letter, “ because we have purchased the property and are the virtual owners thereof, although the deed has not been passed.”
In his letter of April 22 to defendant, accepting the latter’s offer of nineteen thousand dollars for the property, the agent of the owners stated his acceptance to be upon the condition that defendant *1033 assumed all obligations to the lessee of the building. The agent testifies that on same day defendant, through its agent Finley, replied, announcing its acceptance of the proposal to sell for nineteen thousand dollars, the title being found good, and we find such a letter from Finley in the record.
But the owners of the property (there were several) were in distant States, and it required some time to procure the necessary mandates from them to the end of executing formal title to the property. So that it was not until June 17, 1892, that the deed of conveyance was actually signed. And when it was signed, the building No. 14 Magazine street had been entirely demolished and a new structure was either under way or about to be begun by defendant. This being the then condition, the notary, who had been chosen by defendant, inserted in the act of sale a clause to the effect that the property was subject to no incumbrance whatever, except a certain lease, which “ had been annulled by the destruction of the building rented, said building having been destroyed by order of the municipal authorities of the city.” With reference to this clause, the agent of the owner, who signed the act, testifies it was not inserted at his instance — he did not have it put in.
The same day that plaintiff received the notice from defendant’s secretary to remove from No. 14 Magazine street within forty-eight hours, as it was intended to demolish the building, he replied through his attorney that, while he was ready to confer with the board in regard to the matter, he must protect his rights against any attempted infringement', and the whole testimony shows his objections to, and protests against, the proposed demolition of the building, and his insistence that proper steps be taken to protect it against the consequences of the demolition of the adjacent building and to preserve it for his use and occupancy, under the terms of his lease.
He did not remove within the forty-eight hours, and the act of demolition did not begin at the end of that time.
The Tulane Board had first started out with the intention of repairing No. 14 Magazine street, and retaining it intact, while at the same time erecting their eight-story building on the adjoining property.
It is claimed, however, by defendant that the taking down of the buildings on Nos. 10 and 12 exposed such great weakness in No. 14 *1034 that it was found impracticable to repair and preserve it, and the intention toward this building was then changed, and it'was decided to demolish it and rebuild a modern structure on its site.
This was urged by Sully, architect and builder employed by defendant, in a letter to defendant dated April 29.
But the demolition of the building was not begun until after a peremptory order of condemnation had been obtained from the city authorities. This was not obtained until the 17th of May, and when issued was directed to the defendant “ or whom it may concern.” It set forth that the building corner of Magazine and Common streets (No. 14 Magazine), “owned by” defendant, “ owing to the repairs being made and the removal of the walls on both sides of the building places the same in a very precarious and dangerous condition, and that to avoid an accident must be demolished at once.”
It appears that the city authorities had refused to give an order, prior to this, for the demolition of the building, but always that it be repaired and made secure, or demolished, and had duly issued a permit for the necessary repairs to be made.
It also appears that when the order of outright condemnation was issued on May 17, it was based on the then unsafe condition of the building resulting from the taking down at once of both walls — the party wall between Nos. 12 and 14, and the Common street wall of No. 14.
When defendant received this order of condemnation, the next day, through its secretary, it addressed a communication to plaintiff, notifying him to remove all of his effects within twenty-four hours from the building, otherwise it would be done at his expense and risk.
Plaintiff replied in writing immediately, denying the right to demolish the building, that the necessity and order therefor were due solely to defendant’s action in taking down the walls, and protesting and reserving his rights. He stated he would store his furniture, etc., awaiting the re-erection of the building to continue his lease.
Defendant’s agents then entered the building, removed plaintiff’s effects therefrom, and demolished the structure entirely.
The first petition filed in this suit was then pending. It had been filed April 25, 1892. Injunction had been asked against defendant and the agent of the owners, restraining then from interfering with *1035 the possession of plaintiff and from tearing down the walls of the building, but had been denied by the court on the rule to show cause.
After the demolition of the building at No. 14 Magazine street, defendant erected on the site, in connection with its new buildings at Nos. 10 and 12 same street, a modern structure,eight stories high. This was completed in the summer of 1892, and advertised for rent. Whereupon plaintiff, on July 23, addressed a communication to defendant, calling attention to this advertisement, and claiming the right under his original lease of possession and occupancy of the premises.
On the 26th of July defendant replied, denying any right of plaintiff to the occupancy of the premises, or to indemnity of any kind. The board stated, however, that perhaps the real estate committee might agree to pay him a small sum “ as a solaeium,” and he was advised to make application for it.
To this plaintiff replied on the 28th, stating his position and rights, and declining the offer of compensation as being “too trivial to merit attention.”
The lease under which plaintiff occupied the premises recited that the building was in good condition, and the evidence shows it to have been in fairly good condition for an old building, with the exception that the rear part of the wall on Common street had sprung, or was bulged — an old defect which the agent of the owners had agreed to repair and caused specifications therefor to be made.
The testimony of Brown, City Engineer, shows that the city authorities had condemned the building and required its demolition only because both the side walls had been removed, and because the whole building was then held up by shoring. The removal of these walls at same time was the act of defendant.
The evidence, furthermore, abundantly shows that all the appeals made to the city authorities to condemn the building were made by defendant’s agents.
It also shows that defendant corporation knew of the agreement of the agent of the owners to repair the Common street wall, and that after the sale of the property to defendant had been agreed on the latter at first recognized its obligation to carry out this agreement.
The law governing the case is simple and of easy application
*1036 After its several letters asserting ownership of No. 14 Magazine street, and its various acts of dominion and control over the property long prior to the transfer of the actual title, defendant can not be heard now to insist that it did not become owner until June IV, 1892, the day of the formal execution of the act of sale.
So far as the rights of the plaintiff are concerned, growing out of and as affected by the acts and doings of defendant in respect to this property, the Tulane Educational Fund must be held to have acquired the status of owner thereof on April 22, 1892, and plaintiff is entitled to have his claim for damages tested from that standpoint.
If the evidence m the record were not itself sufficient to justify this conclusion, recourse could be had to the judicial admission of ownership during this time found in defendant’s answer to the third supplemental petition filed by plaintiff in this suit.
Defendant purchased the property on the 22d of April, and the formal notarial act of June IV was but the carrying out of the contract made on the earlier date. When it purchased the property in April, not only was the building at No. 14 Magazine street standing, but plaintiff was occupying it under a recorded lease.
By its purchase defendant assumed the obligations of this lease and the character of lessor toward the plaintiff. C. C. 2733, 2011, 2015.
By the textual provisions of the law the lessor is bound to maintain the thing leased in a condition such as to serve for the use for which it is hired, and also to secure the lessee the peaceable possession of the leased premises during the continuance of the lease. C. 0. 2692.
Nor has the lessor the right to make any alteration in the thing during the continuance of the lease. C. C. 2698.
And in case any loss should result to the lessee from the vices and defects of the thing leased the lessor is bound to indemnify him for the same. C. C. 2695.
So, too, if the lessee be evicted the lessor is answerable for the damage and loss sustained by the interruption of the lease. ’ C. O. 2696.
Having purchased the property on April 22, 1892, with this lease upon it, all these obligations of a lessor devolved upon defendant.
Plaintiff thereafter was its tenant.
*1037 Defendant was bound to maintain him in possession of the leased premises, and equally bound to maintain the leased premises in such a condition as to admit of plaintiff’s continued occupancy of the same. If defendant failed in this regard it was answerable to plaintiff in damages.
The evidence not only shows it failed in these obligations to its lessee, but that it was actively instrumental in dispossessing him of the leased premises, and in rendering the leased premises impossible of continued occupancy by him.
Defendant’s contention that there was a necessity for taking down the building No. 14 Magazine street in order to erect its eight-story building on the adjacent site, and enable it to fulfil its contract with Dwyer Bros., even if a lessor can be heard to urge such a plea, the same is not sustained by the testimony. On the contrary, the preponderance and weight of the evidence establishes that with timely and proper repairs and strengthening of the walls of No. 14, the adjoining eight-story structure could have been erected on its pile foundation, leaving No. 14 intact.
It was the duty of defendant, as owner of both sites, to have done this, and its failure in this regard entails upon it the eonséquences the law attaches to a violation by a lessor of the obligations of his lease.
The view we have taken of the case renders it unnecessary to notice other points of attack and defence urged by counsel.
With regard to the amount of damages plaintiff is entitled to recover, we think there must be a reduction of the judgment given below. The judge a quo figured plaintiff’s actual loss at seven thousand one hundred and sixty-four dollars and twenty-four cents. He arrived at this by taking the entire cost of fitting up No. 14 Magazine street for hotel purposes, and then crediting this sum with eight hundred dollars — the amount for which part of the property removed from the building was afterward sold.
But it appears that on the 24th of May, 1892, after plaintiff had been forced out of the building, after the removal of his effects therefrom, and after the destruction of the building itself, he wrote to defendant enclosing a statement of the cost of the improvements under his lease, giving the losses sustained on the outfit, irrespective of loss of business and profits. He avers in the letter that the statement was carefully made by disinterested parties and shows the *1038 losses sustained by him. This statement shows the total cost of the outfitting of the building for hotel and bar purposes to have been five thousand nine hundred and thirteen dollars and fifty-one cents, and the actual loss three thousand eight hundred and thirty-five dollars and one cent.
Subsequently it appears that the bills, invoices, papers, etc., relating to the expense incurred in fitting up the establishment were destroyed by a fire that occurred at plaintiff’s place of business. We think the statement presented by plaintiff on May 24, as showing his losses, is the best criterion by which to judge those losses, and, therefore, on this item of damage, the judgment appealed from should be reduced from seven thousand one hundred and sixty-four dollars and twenty-four cents to three thousand eight hundred and tliirty-five dollars and one cent.'
With regard'to the other item of damage representing the value .of the lease for the unexpired term and the renewal privilege thereof, the judge a quo awarded the plaintiff six thousand seven hundred dollars. This is one hundred dollars a month profit for the time the lease was yet to run, counting in also the renewal privilege. The evidence* abundantly sustains the allowance of an hundred dollars a month profit. This item of damage is clearly proven and plaintiff is entitled to recover for same for the unexpired term of the lease. O. C. 1934, 2315, 2696.
When one party enters upon the performance of a contract and incurs expense therein, and being willing to perform, is, without fault of his own, prevented by the other from so doing, his loss will consist of two distinct items of damages: (1) his outlay and expenses, less the value of materials on hand; (2) the profits he might have realized by performance. The first item he may recover in all cases of losses shown. The second he may recover when the profits are the direct fruit of the contract, and are clearly proven. United States vs. Behan, 110 U. S. 338.
But to extend this allowance of $100 a month profit on the lease to the period covered by the renewal privilege, would be stretching the doctrine too far. It would be trenching too much upon damages of a character remote and speculative. We think, under the circumstances of the case at bar, this element of damages should be confined to the actual period of the lease, and denied for the time (three years) for which the lease might be extended by the exercise of the renewal privilege.
*1039 Plaintiff's right to recover should not be extended beyond what is commensurate with his obligation to pay. He was bound absolutely for the rent of the building only to the extent of the two years and nine months of the lease, and had he thrown up his contract, or abandoned the leased premises, the lessor could not have recovered for rent beyond that period.
The lease began January 1, 1892, and was for a period of thirty-three months. But plaintiff had possession of the building during the first four months of 1892. He was dispossessed about May 1, of that year.
Deducting the four months from the term of the lease, twenty-nine months are left for which plaintiff is entitled to recover two thousand nine hundred dollars, as against six thousand seven hundred dollars, allowed on this branch of the case by the court below.
These several reductions aggregate seven thousand one hundred and twenty-nine dollars and twenty-three cents, and taken from the sum total of the judgment below, thirteen thousand eight hundred and sixty-four dollars and twenty-four cents, leave six thousand seven hundred and thirty-five dollars and one cent as the true amount plaintiff is entitled to recover.
It is therefore ordered and decreed that the judgment appealed " from be amended by reducing its aggregate amount from thirteen thousand eight hundred and sixty-four dollars and twenty-four cents to six thousand seven hundred and thirty-five dollars and one cent, and that as thus amended the same is affirmed, costs of appeal to be borne by plaintiff and appellee.